[No. 1916.]

## Z. P. Weaver v. The State.

1. Practice — Arrest of Judgment — Indictment.— The validity of an indictment is not affected by the failure of the foreman of the grand jury to sign it. Besides, such an exception would be one of form and not substance, and therefore, if available at all, it would not be by motion in arrest of judgment.

2. Same — Continuance.— See the statement of the case for absent testimony set forth in an application for a continuance *held* not to authorize a continuance, when considered in connection with the evidence adduced on the trial.

3. Same — Jury Law — Case Stated.— The special *venire* being exhausted, the court ordered the names of the jurors summoned on the regular panel for the week to be placed in the box to be drawn therefrom, and a list to be made therefrom by the clerk from which the two jurors necessary to fill the panel should be selected. The court overruled the defendant's objection and refused to issue a special *venire* to the body of the county, without reference to the regular jurors summoned for the week. *Held*, correct, and in conformity with the requirement of the statute, *i. e.*, that a special *venire* shall be selected from the names of those persons selected by the jury commissioners to do jury service for the term at which such *venire* is required. The court is authorized to send to the body of the county for a special *venire*, or for talesmen to complete the *venire* or panel, only when the jury commissioners have failed to select jurors for the term, or when a sufficient number of them are not present to perform jury service for the term.

4. Murder — Self-defense — Homicide in Defense of Life or Property.— The rules which are deducible from the principles of law which justify homicide in the defense of life or property are as follows:

(1) To justify homicide in the defense of one's own life or the life of another or others, it must be in necessary resistance to aggression apparently violent, immediate and imminent towards the person about to be injured.

(2) To justify homicide to prevent the perpetration of any other felony, the danger or felony intended must not be problematical or remote, but evident and immediate.

(3) It is, in no case, except as to habitation or castle, justifiable to kill in defense of one's own or the property of another, until every other means have been resorted to to prevent the injury or violence attempted.

(4) In no case of felony or attempted felony is it lawful to take life where the party may be arrested and the felony thereby prevented.

(5) Any person may arrest, with or without warrant, a party committing, or who has committed, a felony in his presence or within his view. See the opinion *in extenso* for an elaborate discussion of these principles, and the statement of the case for evidence to which it is *held* the defense is not applicable.

5. Same — Charge of the Court.— See the opinion for instructions of the trial court, objected to because they presented an issue not authorized by the evidence. *Held*, that if the charges were unauthorized by any evidence in the case, they gave the defendant the benefit of a defense to which he was not entitled, and, as they announce the correct doctrine upon the questions they treat, the defendant cannot be heard to complain.

6. Murder — Fact Case.— See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree, though the deceased, when killed, was placing an obstruction on the track of a railroad.

Appeal from the District Court of Williamson. Tried below before the Hon. A. S. Walker.

The appellant was indicted in the district court of Williamson county, Texas, on January 10, 1885, for the murder of one Shep Wilson in Williamson county, Texas, on August 31, 1884. The case was tried at the July term, 1885, and resulted in a verdict of murder

in the first degree, with a life term in the penitentiary assessed as the penalty.

Joseph Petmecky was the first witness for the State. He testified that he was a resident of the city of Austin, Texas, in which city he was engaged in the sale and renting or hiring of fire-arms, and the sale of ammunition. The witness identified the defendant as a man whom he saw for the first time in August, 1884. He also identified the double-barreled shot-gun in evidence as his property. He last had the gun in his possession when he hired it to a man who said that his name was Weaver. Witness was not certain that the defendant now on trial is that man. However, the man to whom he hired the gun came to the witness's store in Austin, and asked for the gun and a half dozen buck shot cartridges, for a term. The witness demanded references, and he referred the witness to Mr. Simpson, and to Mr. D. W. Weaver, a merchant of Austin, whom he claimed as a relative. The references being satisfactory, the witness hired him the gun, and furnished him the cartridges. The man told the witness that he wanted the gun to guard the narrow-gauge railway track; that persons had been placing obstructions on the said railway track, and that it was his purpose to guard the track with the gun. Near dark one evening, about one month later, the defendant came into the witness's store in Austin, and stood for a time looking over the witness's show-case. He finally asked the witness if witness knew him. Witness replied that he did not. He appeared both surprised and amused, and laughed at the witness's failure to recognize him. He then said that his name was Weaver, and that the gun he hired from the witness was at Georgetown in the possession of the authorities, and that he was charged with having killed a negro. The witness could not identify the defendant as the man who hired the gun from him, but knew him to be the same man who came to his store in Austin afterwards, and told him that he was the man Weaver who hired the gun. The witness heard of the killing of the negro within a week after the man who gave his name as Weaver came to his store and hired the gun.

The two cartridges exhibited to the witness were similar to the cartridges prepared by directions of the witness. The cartridges in evidence contain nine buck shot, and the witness instructed his clerk, Mr. Price, to put nine buck shot in the cartridges he prepared. The buck shot in the cartridges in evidence, and those prepared by the witness, were of the same size-number. Witness could not identify the cartridges in evidence as those he had prepared and delivered to

the defendant. The gun is number ten in size, and the cartridge wads are number ten in size. Two wads which had been discharged from a gun were here shown to the witness, and he declared them to be a shade smaller than the wads in the ends of the cartridges exhibited. Witness could not recall the date on which he had the transaction related with the man who called himself Weaver, but it was not long before the negro man was killed at Cummings on the narrow-gauge railway.

Cross-examined, the witness testified that when he instructed Mr. Price to prepare the cartridges, he told him how to make them. Witness could not identify the cartridges in evidence, as two of the six prepared by Mr. Price under his direction. The difference in the sizes of the burnt wads exhibited, and the wads in the ends of the cartridges in evidence, is but slight. There is very little difference between the bore of a number ten and a number twelve gun, the number twelve being a very little smaller. · Witness did not see the cartridges loaded, but a number ten wad would have been used in loading a number ten cartridge. The firing of a cartridge in a gun will not disturb the size of the paper either by enlarging or decreasing it, but the felt filling would expand and become larger.

Re-examined, the witness said, with reference to other wads exhibited, that no breech-loading shot-guns between the numbers ten and twelve were manufactured. There was no such thing as a number eleven wad. The burned wads appear to be between number ten and twelve in size, and nearer ten than twelve.

L. J. Potter was the next witness for the State. He testified that he lived at Waters station, in Travis county, Texas, which station was at the crossing of Walnut creek, on the Austin & North Western Railway. He heard of the killing of Shep Wilson on the morning of Tuesday, September 2, 1884. Witness had then known the defendant about twelve months, during two of which he lived near the witness's house. Witness saw the defendant between 7 and 8 o'clock on the morning of Monday, September 1, 1884. He came into the witness's store with a double-barreled shot-gun in his hands. Witness asked him who he was going to shoot. He replied that he was going to shoot no one, and that his gun was not loaded. He waited at the defendant's store until the out-bound train from Austin to Burnet arrived, when he boarded it and left. Witness asked the defendant how he came to be at his store so early in the morning. He replied that he came out from Austin on a wagon. Witness saw the defendant going towards the train, but did not see him board it. He then had his gun with him, and witness saw no more

of him. The news of the killing of Shep Wilson was reported to witness on the next morning.

Cross-examined, the witness testified that his store at the Big Walnut crossing was nine and a half miles distant from Austin by the wagon road. The defendant was coming into the witness's store when the witness first saw him on the morning of September 1, 1884. Witness, who was the postmaster at Big Walnut, had to take the mail bags to the train, and as he started with the bags on that morning the defendant left the store with him, taking his gun in his hand. Witness did not know the distance between his store and Cummings, but thought it was about six or seven miles, Cummings being towards Burnet from witness's store. Defendant purchased a pack of cigarettes from the witness.

Re-examined, the witness was handed an advertisement which, after reading, he said he had seen before. The advertisement in evidence, or one like it, was posted up at the witness's store — on the door,— and others were posted elsewhere about. The copies of the advertisement were posted by railroad hands. Witness knew of no obstructions being placed on the track of the railway about that time, but it was currently reported that obstructions had been discovered from time to time, and much excitement prevailed.

The State then introduced in evidence the advertisement, which reads as follows:

"$200 REWARD!

"Is offered for the identification or conviction of the person or persons who have attempted, or shall hereafter attempt, to wreck trains on the Austin & North Western Railroad, by placing obstructions on the track or otherwise; the award to be paid as follows:

"$100 by J. A. Rhomberg individually.

"$100 by J. A. Rhomberg, Receiver.

"The same to be paid whether the guilty parties be arrested and convicted, or shot and killed while in the act of attempting to wreck a train.

"J. A. RHOMBERG, Receiver.

"*Austin, Texas, August 25, 1884.*"

M. R. Crook was the next witness for the State. He testified that he lived in Williamson county, Texas, about six miles above Round Rock, and had lived there about two years. The witness was a farmer and stock raiser, and had a flock of sheep on his place in August, 1884. The witness knew Shep Wilson, the deceased, and had him in his employ about seven weeks, commencing in July, 1884. Deceased was shot and killed on Sunday night, August 31,

1884. The witness last saw the deceased alive about 8 o'clock on Sunday morning. He was then in charge of a herd of sheep about a half a mile from where his dead body was found. His body was found close to the railway track near Cummings, at about 1 o'clock P. M., on Monday, September 1, 1884. Nine buck shot had entered the body at the side and back, five at one place and four at the other. The holes were made by two charges of a gun. The holes in the back were easily covered by the hand of a man, and those in the side covered a smaller space. The body, when the witness saw it, was lying on the right side, and the indication was that the wound in the left side was inflicted after the deceased had fallen. The witness was perfectly satisfied that the deceased was first shot in the back. The body was found near a "cut" on the railroad track. The "cut" was not more than ten feet wide. A large rock, weighing at least fifty pounds, lay between the ends of the ties and the wall of the "cut," which walls were about two feet high. The witness was satisfied, from the attitude in which the body lay, that the wounds in the back could not have been inflicted after the deceased fell. The witness searched for his sheep near the place where the body was found, from some time before until about dark on Sunday evening. and looked for the deceased until some time after dark. He found his sheep about a quarter of a mile east of the point where the body was subsequently found. The witness did not find deceased on Sunday night. When the body was found the hands were closed. The ball of the hands next to the wrists were stained with clay, but the insides of the hands were perfectly clean. The rock had white powder or dust over its entire face, and could not be touched without removing some of it. Other rocks lay near the large rock described. The railroad track from that point east towards Austin was perfectly straight for a distance of five hundred yards, and obstructions could be easily seen for a distance of three hundred or four hundred yards. The train from Austin passed that point on Saturday at thirty-five minutes past 8 o'clock, A. M., and passed back from Burnet at about 4 o'clock, P. M. The next regular train was due from Austin on Monday morning, no regular trains traveling on Sunday.

Cross-examined, the witness stated that he lived about half a mile distant from the railroad track, and about a mile from the point where the body of the deceased was found. There was a bend or curve of the track at the "cut." The curve turns to the left or south, going towards Burnet. An obstruction at that point could not be seen from the engine coming from Burnet, until it was very

nearly reached. The cut commenced on the Austin side of the body, but very near it, and extended some two hundred or three hundred yards towards Burnet, through the rocks. The cut and the embankment together made the distance from the top of the cut to the rails, some three or four feet. The cut at that point was very narrow. The rails were three feet apart, set on ties seven feet long. The ditch between the embankment and the ends of the ties was about a foot wide. The body lay on the south side of the railroad track. The head lay diagonally to the track towards Burnet and the feet. One boot slipped off the bank near the rock, which was in the ditch. The stone was between the legs of the body, and nearer the right than the left leg. There was some powder or dust on the ties, as if a rock had been rolled over them. On the Saturday before the deceased was killed the witness paid him for seven weeks' work. On Sunday morning the witness went with the deceased and the sheep to a point within a half mile of where the deceased was killed. Witness afterwards went to church, and returned home when the sun was about a half hour high. The rock described by the witness as the one found lying between the legs of the deceased was a round limestone rock. That rock had been transported to that point from another. The witness did not think that the rock could have been brought to that point from another without leaving some evidence upon the hands of the person who transported it. The earth about the point where the body lay was of red clay. The ground gave no indications whatever of a struggle, and the witness was positive, from the manner in which the body lay, that the wound in the back could not have been inflicted after he fell. Witness did not walk the track on that day to see how far an obstruction could be seen from the body, but, as he had walked that track every day for a long time, he knew that the rock was visible to a person going towards it from Austin, at least four hundred yards. Witness thought that the deceased knew at what hours the train passed the point at which he was killed. Witness knew by hearsay only that a negro woman had been run over by a train on that line and killed, but he knew of no effort on the part of the negroes to take and mob the engineer or conductor. He knew of no obstructions ever having been placed upon the track, though he had heard as much.

Re-examined, the witness testified that his dog, of the shepherd breed, was with the body when it was found. It lay under a rock near the body. Witness left that dog with the deceased on Sunday morning, and saw nothing more of him until he found the body on

Monday morning. The dog was not with the sheep on Sunday night.

J. G. Lux testified, for the State, that, for the past eighteen months, he had lived at Cummings, in Williamson county, on the Austin & Northwestern Railway. The town of Cummings was about three and a half miles above the point where the Austin & Northwestern crossed the International Railroad. Witness occupied a house furnished by the railway company. Witness had known the defendant about two years. Defendant had been in the employ of the Austin & Northwestern Railway Company, and for a time served as a fireman. The witness thought that the defendant knew the schedule hours of the said railway, and the exact time it would pass any given point. No regular trains traveled over that line on Sundays, but extras frequently ran on Sunday. Witness knew the deceased, and had seen the place where his dead body was found, though he did not see the body. The defendant came to the witness's house on Monday in the last week in August, 1884, and told witness that Rhomberg had sent him there to board awhile, and to guard the track, with the view of apprehending parties who had been placing obstructions on the track. He had a double-barreled, breech-loading shot-gun with him, such as the one exhibited in evidence, and cartridges which looked like those in evidence. This was five or six days before the deceased was killed. He left the witness's house on foot, on the same day that he came, a short while after the train passed. He went up the road towards Burnet, taking his gun with him. He returned, bringing his gun with him, about three or four hours later, and remained at the witness's house until just before the down train arrived, when he went off, and returned again late in the evening and remained over night. Next morning he left before the train arrived, and returned three or four hours later. He left again before the down train passed, and returned late in the evening and remained over night. He passed every night except Sunday night at the witness's house. He always left before trains arrived and came back afterwards, sometimes bringing his gun and sometimes leaving it, he said, because it was rather heavy to carry. He always brought the gun back at night. He always went away from the witness's place towards Burnet, and he always came back from the same direction. Witness went to Austin on Sunday, August 31, 1884, leaving the defendant at his house. He had been at the witness's house every night since the previous Monday. Witness returned home from Austin on Tuesday. He heard of the killing of Wilson on Monday while he was

still in Austin. Witness did not see the body. The defendant never told the witness what distances he went on his excursions. Kelley, the section foreman, boarded with the witness.

Cross-examined, the witness testified that he saw, but noticed nothing peculiar about, the cartridges the defendant had while at his house. No construction trains were running at or about the time the deceased was killed. "Sunday specials" were frequent before and after. The defendant told witness that Mr. Rhomberg, the receiver of the Austin & Northwestern Railway, sent him to try and detect the parties who had been placing obstructions on the track. He invariably left witness's house in the morning and evening, and said that he went for the purpose of ascertaining whether or not the track was clear of obstruction. Witness knew of no other guard on the line of the road. Witness knew the deceased. He was employed by Mr. Crooks as a wood-chopper and sheep-herder. Witness did not think that deceased had been in the employ of the railroad at any time. Witness had never heard the defendant speak of the killing of a negro woman by the train.

Re-examined, the witness testified that the defendant usually, if not always, went up the track as early as 6 o'clock, before breakfast, and before the train from Austin was due. He was generally absent on those excursions from three to four hours. He never said what he carried the gun for. He always got his breakfast on his return, and would repeat his excursion in the afternoon before the arrival of the down train, and return about dark to remain over night.

A. H. Kelley testified, for the State, that he had been the foreman of sections two and three, on the line of the Austin & Northwestern Railway, since June, 1883. He had known the defendant some two or three years, during which time, at different periods, the defendant was in the employ of the railway, for a while as brakeman, and for a time as fireman. Witness could not remember when he was last in the service of the said railway. Witness saw him in the town of Cummings in August, 1884, on or about the last Monday, and about dark on that day. Witness did not know how the defendant reached Cummings,— whether by railway or other conveyance. He came to the section house kept by Mr. Lux. He slept on a bench outside of Lux's house. Witness did not converse with him, but saw him once or twice at dusk during the week, coming to Lux's house from the direction of Burnet. On each of those occasions he carried a gun. Witness generally left the house about 7 o'clock in the morning, and thought that, had the

defendant been about Lux's place and up, he would have seen him. Witness had never seen him at meals. To the best of the witness's recollection the defendant slept on a bench outside of Lux's house every night except the last night of August, which was Sunday. Witness saw him about 6 o'clock on Sunday evening, and had never before known him to come back to the house as early. He slept in the witness's room on that Sunday night, because, he said, it was cool outside. Witness looked at the gun one night and found it loaded, but could not remember that that night was the Sunday night the defendant slept in witness's room. Witness went to work below Waters station on Monday morning, and heard of the killing of the deceased on that evening. Witness was accompanied by the defendant from Cummings to Waters station on that Monday morning. Defendant got off at Waters, and witness went on. They reached Waters about twenty-five minutes before 8 o'clock, and met the morning train before they got there. Witness saw no more of the defendant on that or the next day. Mr. Potter keeps the station at Waters, where the defendant got off of the hand-car. The witness heard of the killing on that evening, and the place where it occurred was pointed out to him, but he did not see the dead body. That place was at the end of a "cut," and at a curve of the road about two miles west from Cummings towards Burnet. The road from the point where the killing was said to have taken place towards Austin was straight for some distance, and the track could be seen plainly for a distance of two hundred yards from that point. The curve, going from Austin, turns to the north or right. The killing was said to have occurred just at the tangent of the curve. On the Monday after the killing, the defendant told the witness that he wanted to go to Waters, and witness took him there on the hand-car. The witness, at the request of H. C. Smith, roadmaster of the Austin & Northwestern Railway, posted up one or two copies of the advertisement in evidence. Waters is seven miles south of Cummings in the direction of Austin. The witness knew that the defendant did not go from Austin to Waters on a wagon on the Monday in question, because, as stated, he took the defendant from Cummings to Waters on a hand-car on that morning.

Cross-examined, the witness stated that he had been section boss of sections two and three on the said railway for twenty months. His jurisdiction began at a point ten miles from Austin and extended twenty miles further towards Burnet. The killing occurred on one of the witness's sections. It was the business of the witness

to go over the line of the railway on his sections and repair the track and keep it in repair. The defendant had formerly been in the employ of the company as fireman, and at one time the witness thought as brakeman. Witness first saw defendant at Lux's on the Monday evening prior to the killing. He was there at about 6 o'clock in the evening, coming towards the house from the direction of Burnet. Witness paid no attention to the defendant's movements, and never observed him in the mornings. Witness got up early as a general rule, and left Lux's by 7 o'clock. Witness could not remember that he saw him on any day of that week at noon, nor could he remember that he was at Lux's at noon himself on any day of that week. He saw the defendant on two or three different evenings, and each of those occasions he came to Lux's after witness had arrived. Witness could not say whether or not the defendant was about Lux's house on Sunday, August 31, 1884. Some eight or ten persons were at that house throughout that day, and instead of noticing them the witness spent his time reading. Defendant came to Lux's house about 6 o'clock on that Sunday evening, and complained that the weather towards morning was rather too cool to sleep out of doors, and either witness or Mr. Smith invited him into the house. He acted upon the suggestion and slept in the same room that the witness did, though in a different bed. When the party, including witness and defendant, started on the hand-car on Monday, towards Waters, the witness made the defendant unload his gun as a precaution against accident. Defendant got off at Waters, and witness went on about three miles further, meeting the Burnet-bound train from Austin and saw no more of the defendant on that day. Witness did not remember who pointed out to him the point where the killing occurred, but thought probably Superintendent Smith did. The place of the killing was shown to the witness several days after the killing occurred. The "cut" along the curve, beginning at the point where the body was said to have been found, extends two hundred or two hundred and fifty yards towards Burnet and deepens gradually. For a distance of five hundred yards east of the cut, the road is straight and the grade falls to the cut. The soil was red clay and was covered with limestone and honeycomb rock. The cut is rather narrow. The track from rail to rail is just three feet and one inch wide. The ties are just seven feet long, and the ditch at the end of the ties is just one foot wide, and a foot deep. The "cut" is perhaps ten feet wide, and possibly a little wider. Witness did not remember that the brush grew up to the track. The witness did not remember that he had recently cut it out, and did not

know how far up the road an obstruction at the point where the body was found could be seen at that time. How far an obstruction at that point could be seen from down the road towards Austin would depend very much upon the condition of the brush and weeds. Witness was on the ground a few days — certainly within a week — after the killing occurred. Witness observed nothing strange or unusual in the defendant's deportment either on Sunday or Monday,— the supposed day of, and the day after, the killing. Road Superintendent Smith gave witness the advertisements to post, before the killing occurred. The witness knew of obstructions having been placed upon the road track prior to the killing. Witness removed such obstructions from the track as many as a dozen or more times. On one occasion the witness removed an obstruction from the point on the track where the body was found. He removed several from different points in the cut. He removed one obstruction about a week before the defendant appeared at Lux's house. On one particular day he removed obstructions at two different places. Witness found those obstructions in passing over the line of the road in the discharge of his duties. Some time before the killing, a negro woman was run over and killed by the train a short distance below Waters. Witness did not know whether or not that woman was kin to deceased. All of the obstructions known to the witness were placed upon the track after the woman was run over and killed. No obstructions had been placed on the track since the dead body of the deceased was found, other than the placing of some spikes between the rails. The negro woman who was killed was run down in the open prairie, and the killing created a great deal of feeling among her friends. The obstructions which the witness found upon the track after the woman was killed were of stone, and were sufficient in size and strength to throw a train from the track.

Re-examined, the witness stated that the negro woman who was killed was run over in the open prairie where the view was open and clear for a half mile. The woman was run down sometime before the killing of Wilson. The witness was not over that part of the track on which the deceased was killed during the week that the defendant was at Lux's house. Obstructions were found on that part of the track during the previous week. Obstructions had never been placed, so far as the witness knew, on any other part of the track than in the "cut" at the mouth of which Wilson's body was found.

J. M. Glenn was the next witness for the State. He testified

that, on Sunday, the day before Wilson's body was found, the witness was at Carpenter's, about one mile from the point of the killing. While *en route* to Carpenter's from Liberty Hill, the witness heard two shots in the direction and in the neighborhood of the point where Wilson's dead body was found on the next day. Witness thought at the time that the reports were those of a shot-gun. They were fired between 4 and 5 o'clock. Witness did not think at the time that the shots were at a point quite so distant as the point where the body was found. The shots were fired near together — within two minutes of each other. Witness was at the inquest next day, arriving between 2 and 3 o'clock P. M. Defendant was arrested on that evening, and a shot-gun was taken from him. The witness was summoned as one of the *posse* to make the arrest. Witness saw gun-wads at the inquest, but did not know where they were obtained. The witness examined the ground about the place of the killing, and noticed that bushes grew up to within a short distance of the track. In the brush, about thirty or forty yards from the point where the body was found, the witness found the stumps of some partially smoked cigarettes. The place where the cigarette stumps were found was in the direction of Austin from the body. The brush, weeds and grass at that point had been trampled down. The witness found two places where the grass and weeds had been trodden down,— one about thirty and the other about forty yards from the body. He saw no tracks. The soft white rock which lay near the body looked like it had been handled.

Cross-examined, the witness testified that he lived south of the track, and a very little south of opposite the point where the body was found. Carpenter lived east and south from the witness. By the road which witness traveled from Liberty Hill to Carpenter's house, he would at no point be nearer than a mile to the point where the body was found. Witness was near Carpenter's place and south of the point where the body was found when he heard the two shots fired, and they appeared to have been fired from a point somewhat to the east of witness. Witness did not think the shots were fired from a point as far off as a mile. The conditions under which the report of a gun can be heard as far as a mile must be extraordinarily favorable. The witness did not undertake to say that he heard the reports of the gun which killed the deceased, or that the reports he heard were reports of a gun fired at the point where the body was found. When the witness first saw the body, between 2 and 3 o'clock on Monday, the body did not look like it had been

moved.    Witness saw nothing on the railroad track.    The body lay twenty-five or thirty feet from the "cut."

J. H. Faubion was the next witness for the State.    He testified that he lived at Leander, in Williamson county, Texas, and was a justice of the peace in 1884, and as such held the inquest over the body of the deceased in September of that year.    He reached the body between 2 and 3 o'clock on the 1st day of September.    The body lay at a point on the Austin & Northwestern Railway about three miles from Cummings station towards Burnet.    The wounds, several in number, the witness thought were made by a shot-gun fired twice.    The body lay at the entrance of a cut, the surface of the ground being of hard, white limestone rock.    One, and perhaps two or three, rocks looked very much like they had been moved.    One of those rocks, the surface of which was white and soft, lay across the railroad track, and would weigh from one hundred and fifty to two hundred pounds.    That rock, the witness thought, had been moved from across the track.    He found dents on the ties, as if some heavy body had been rolled over them.    The track was not obstructed by the rock when witness arrived on the ground.    The two or three rocks referred to showed the effects of exposure to the atmosphere.    They were covered with a white dust which resembled slacked lime.    Those rocks could not be handled without the slacking or dust adhering to the hands, as was demonstrated on the ground.    Witness examined the hands of the deceased, which he found closed.    The palms of the hands were clean, but a little of the rock-dust and some dirt was adhering to the back of his knuckles, and to the balls of his wrists.    The train passed while the inquest was being held, and the defendant, who was on board, was arrested.    His gun was found in the engine cab.    Witness delivered the gun to the county attorney, and, as he did not examine it critically, would not recognize it now.    He saw J. N. Stewart draw the charges from the gun after the arrest of the defendant.    Two or more buck shot cartridge wads were found on the ground, which, according to the recollection of the witness, were delivered to the county attorney.

Cross-examined, the witness testified that he lived some seven or eight miles distant from the point where the body was found.    Several parties were at the point where the body lay when the witness reached it.    Witness saw the cartridge wads handed around for examination, but did not see them taken up from the ground.    Witness thought the large rock described capable of throwing a train from the track.

Re-examined, the witness said that he examined the brush about the body, and at some distance found unmistakable evidence of the recent presence of some one. The brush was trodden and bent down, and fragments of an envelope, cigarettes and matches lay around.

J. N. Stewart testified, for the State, that he lived about two miles from the point where the deceased was killed. He reached the body between 10 and 11 o'clock A. M. The body then lay at the entrance of the cut at the curve. The cut at that point was two or three feet deep. Four buck shot had penetrated the back, two near the spinal column, and two near the shoulder blade, and five had entered the body on the left side. The body lay on the right side, the arms drawn up under the head, and the hands closed. The palms of the hands were clean, but there was dust and dirt on the outside of the knuckles and on the balls of the wrists. A large limestone rock lay near. That rock could not have been touched without dust adhering to the hand that touched it. Witness saw the negro Jim Washington have gun wads in his hands on the ground. Witness saw the pieces of cigarettes, matches and paper described by previous witnesses in the brush some little distance from the body. Witness secured the wads referred to, and kept them until he turned them over to the county attorney on the trial of this case.

Cross-examined, the witness stated that others were with him when he arrived at the point where the body lay, but they found no one there. The presence of the dead body at the point described was reported by persons on the train at Brueggerhoff, a station up the road. Witness described the position and condition of the body as it was described by previous witnesses. Witness found two places where a person had laid concealed in the brush. One was about thirty yards distant from the body, where the shade would fall in the morning. The other was about forty yards distant, where the shade would fall in the evening. A person lying down at either of those places would be out of sight from the railroad track.

George Cluck, testifying for the State, described the condition of the hands of the deceased, and the character of the large rock, which seemed to have been moved from some point to the railway track, also the two places in the brush where some person had been concealed, and the two cartridge wads, just as they were described by former witnesses. He saw the defendant arrested and his gun taken from the engine box. Witness did not think that a person hidden

at either of the places in the brush could have been seen by a person walking on the railroad track, but thought he could see the person on the track.

H. S. Jennings testified, for the State, that he was deputized by Justice of the Peace Faubion to summon the jury of inquest and arrest the defendant. He did both. He arrested the defendant on the train and got his gun from the engine cab. When the train arrived at the place where the inquest was being held, and where the dead body lay, witness went through the train and called for Weaver. Defendant did not answer when the witness first went through, nor did the witness know that he was then on the train. Witness saw some cartridge wads on the ground similar to those in evidence, but did not see them picked up. He saw them passed around for examination. Witness went through the two cars which formed the train and called for Weaver. Nobody answered. Witness then went back through each, and asked each man if his name was Weaver. Defendant, when reached and so asked, replied in the affirmative.

William Oberwetter testified, for the State, that in August and September, 1884, he was the express and baggage agent on the Austin & Northwestern Railway. Witness had known the defendant for some time before the death of the negro. He saw the dead body of the deceased near the railway track where it was found. He saw the defendant on the same morning as the Burnet-bound train stopped at Waters station. He was then walking from Potter's store to the engine with a double-barreled shot-gun in his hands. He got on the engine and stayed there. He did not go into the cars during the trip up. The train was stopped some twenty or thirty yards from the body of the negro. Witness thought the train was flagged, but did not positively know. Witness got down from the train and assisted to remove a large two hundred pound rock from the track. He did not turn over or otherwise disturb the body, which was lying, face down, near the rock. Witness did not see Weaver get off at that point. Witness did not in fact see him get on or off the train again until that evening when the train reached the point where the body lay, on its return trip. Witness saw him then, but did not see him arrested. The train on the said railway ran from Austin to Burnet in the morning and back in the evening. There was no special train up or down on the Sunday prior to the homicide.

Cross-examined, the witness said that the rock obstructing the track at the point where the body lay was large enough to throw a

train off the track. Witness did not know who gave the alarm when the train stopped before reaching the body. The rock lay directly opposite the body, and about three feet distant. The body was not moved while witness was present. It was not an unusual thing for employees of the road to ride on the engine, and witness had often seen the defendant riding on it. The witness had no recollection of seeing the defendant from the time they passed the body in the morning until they got back to the body in the evening.

M. R. Crooks, recalled for the State, testified that, for two weeks prior to the killing, the deceased had been cutting wood for witness, from five hundred yards to a half a mile distant from the point where his body was found, and the witness himself had charge of the sheep. The deceased herded the sheep only on the day of his death, August 31, 1884. He could not have gone from the point where he chopped wood to the place where his body was found without the witness seeing him, or at least knowing it. Witness's wagon ran all the time from where the deceased was chopping wood to the house.

County Attorney Cochran testified that he got the gun in evidence from Justice of the Peace Faubion, and the wads from J. N. Stewart.

The application for a continuance referred to in the second headnote of this report set out that the defendant expected to prove by the absent witness Wilke that he, Wilke, was familiar with the country where the killing occurred; that he knew of obstructions being placed on the railroad track at and near this point several times before the killing; that these obstructions were frequent and dangerous; that witness was a passenger on the train when such obstructions were found and removed; that he was a passenger on the train when the body of deceased was found; that he was one of the first persons to reach the body; that he examined its position and condition with great care; that the position of the body, and the condition of the hands, and the position of a large stone placed upon and near the track, indicated that said deceased was in the act of placing an obstruction on the track when killed; that said body and stone had not been moved or tampered with after the body had fallen, and that deceased was killed in the act of placing said obstruction on the track.

The motion for new trial raised the questions discussed in the opinion.

*Robertson & Williams* and *Makemson & Price*, for the appellant. The court had no right or power to direct the sheriff from what

particular body of men he should summon the talesmen. It was appellant's right to have them summoned according to law. The court could as well have ordered the jury filled up with farmers, mechanics, or merchants, or with white or colored men. He could as well have named the men to be summoned. The jury was not selected according to law. (Code Crim. Proc., arts. 610, 611 and 612.)

The court erred in paragraphs 12 and 13 of the general charge, in presenting a hypothetical case not warranted by the facts in evidence, and calculated to mislead and confuse the jury, and because a comment on the weight of the evidence.

This portion of the charge reads as follows:

"12. The act of wilfully placing an obstruction upon the track of a railway, endangering human life thereby, is a felony; and under the law any person may, without warrant, arrest the offender when the offense is committed within view of the person making such arrest; but under the law neither officer nor other person can lawfully take the life of such offender, whose arrest may be so made or sought to be made, unless the officer or other person making the arrest has just ground to fear his own life will be taken, or that he will suffer great bodily harm; in which cases life may be taken.

"13. If, therefore, the jury find from the testimony that the deceased placed such obstacle upon the track of the Austin & Northwestern Railway, endangering human life, in view of defendant, and that defendant sought to arrest deceased, and that deceased resisted, or so acted as to give the defendant just ground to fear his own life or great bodily harm, and that in such circumstances the defendant shot and killed deceased, then such killing is by the law excused, and the jury should acquit.

"If, however, in such attempt by defendant to arrest deceased, and if there be in evidence nothing showing, or tending to show, that the deceased so acted as to give defendant just or apparent ground of fear of his life, or of great bodily harm, and if the jury find from the testimony, beyond a reasonable doubt, that in such circumstances the defendant shot and killed deceased, then such killing would be unlawful, even if the killing was made in attempting the arrest of the deceased; and if the killing was intentionally and deliberately done the act would be murder.

"The mere placing of the stone upon the railway track, if done, would not excuse or justify the killing, if proved."

To this charge appellant at the time specially excepted.

There was no evidence of any attempted arrest of deceased by

appellant, and of resistance to such arrest, and the statement of facts will not disclose any testimony tending in that direction in the most remote degree. The court presents an issue not raised by the facts, and wholly unsupported by facts.

The supposed grounds of excuse and justification as presented by the court were not raised by evidence offered by defendant, or by evidence in behalf of the State. The court confines the grounds of excuse or justification to the single fact of whether or not there was an attempted arrest, without evidence or suggestion of such theory. This charge does not set forth the law of excusable or justifiable homicide as applied to the facts in evidence. This charge is a comment on the weight of the evidence, and does not state the law of this case.

The concluding portion of paragraph 13 does not state the correct rule of law applicable to this case. The court, in paragraph 13, charges the jury that if the killing was done in a supposed state of facts it would be murder, but nowhere tells them of what degree of murder. This charge does not state the law— is too narrow in its compass, cuts off all right of defense of person and property, hedges about the railroad wrecker with the security of the peaceable citizen, and places upon the slayer of one of these enemies of mankind penalties that the law does not call for or justify. (*Shultz* v. *The State*, 5 Texas Ct. App., 390.)

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. This appeal is from a judgment of conviction for murder of the first degree, life imprisonment in the penitentiary being the punishment assessed.

Three preliminary questions are raised, which we will dispose of before proceeding to a discussion of the merits of the case. 1. A motion in arrest of judgment attacked the sufficiency of the indictment, because it was not signed officially by the foreman of the grand jury, as provided by Code Crim. Proc., art. 420, subdivis. 9. It is expressly declared by a subsequent provision of the Code of Criminal Procedure, that exception to the form of an indictment for the want of the signature of the foreman of the grand jury is not maintainable. (Code Crim. Proc., art. 529, subdivis. 2.) Failure of the foreman to sign it does not affect its validity. (*Pinson* v. *The State*, 23 Texas, 579; *State* v. *Powell*, 24 Texas, 153; *Hannah* v. *The State*, 1 Texas Ct. App., 578; *Campbell* v. *The State*, 8 Texas Ct. App., 84; *Jones* v. *The State*, 10 Texas Ct. App., 552; Willson's

Crim. Forms, p. 17.) Moreover, such exception, if maintainable, would be one only as to form and not as to substance, and could not therefore be made available on a motion in arrest of judgment. (Code Crim. Proc., art. 787; Clark's Crim. L., p. 579 and note; *Jones* v. *The State*, 10 Texas Ct. App., 552, and *Johnson* v. *The State*, 14 Texas Ct. App., 306.)

2. The overruling of defendant's application for continuance. Considered in the light of the testimony adduced on the trial, the facts desired to be proven by the absent witness Wilke are shown to be immaterial to the issue to be tried; and, besides, these facts were amply proven by other witnesses, and there was no contest concerning them. We cannot see that the court abused its discretion in overruling the motion, to the detriment of defendant. (Code Crim. Proc., art. 560, subdivis. 3 and 6; *Woodward* v. *The State*, 9 Texas Ct. App., 412; *Grissom* v. *The State*, 8 Texas Ct. App., 386.)

3. The organization of the jury. After the special *venire* was exhausted, the court, over objections by defendant, ordered the names of the jurors summoned on the regular panel for the week, twenty-four in number, to be placed in the box, to be drawn therefrom, and a list to be made by the clerk from which the two remaining jurors necessary to fill the panel should be selected. Appellant objected and requested the court to issue a special *venire* to the body of the county, without reference to the jurors summoned for the week. This request was refused, and the remaining jurors were selected as directed from the regular jurors in attendance for the week. Appellant exhausted his peremptory challenges in obtaining the eleventh panel. We are of opinion the action of the court in this respect was just what the statute expressly requires, viz.: that a special *venire* shall be selected from the names of those persons selected by the jury commissioners to do jury service for the term at which such *venire* is required. (Code Crim. Proc., art. 610.) It is only in cases where no jurors have been selected by the jury commissioners for the term, or where there shall not be a sufficient number of them to make the number required, that the court is authorized to send to the body of the county for a special *venire* or for talesmen to complete the *venire* or the panel. (Code Crim. Proc., arts. 611, 612.) And it is only after the special *venire* and the jury box are exhausted that talesmen from the county can be ordered. (*Roberts* v. *The State*, 5 Texas Ct. App., 141.) No objection is urged that the jury as selected was not a fair and impartial one. (*Woodard* v. *The State*, 9 Texas Ct. App., 412; *Loggins* v. *The State*, 12 Texas Ct. App., 65.)

With regard to its merits the whole case may be briefly summed up for appellant thus: If appellant killed deceased, it is claimed that then he was justifiable in doing so, because, at the time of the homicide, the deceased was in the act of placing, or had in fact already placed, an obstruction upon the track of the Austin & Northwestern Railroad, with intent to wreck the train and thereby endanger the lives of persons upon said train. Or, if not justifiable, then that appellant's offense in killing deceased could not amount in law to a higher grade of crime than manslaughter. We will premise the discussion of these theories by stating that, under our statute, it is made a felony to wilfully place an obstruction endangering human life upon a railroad track, and if human life is lost by such unlawful act the crime becomes murder. (Penal Code, art. 678.)

Homicide is permitted by law when inflicted for the purpose of preventing the offense of murder, whether committed by the party about to be injured or by some person in his behalf; but the killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense. (Penal Code, art. 570, and subdivis. 2.) In such circumstances the killing is justifiable on the principle of necessary self-defense. The whole doctrine of self-defense rests upon the comprehensive principle of reasonable necessity, and apparent reasonable necessity is the whole law of defense. It is the right to do whatever apparently is reasonably necessary to be done in warding off or avoiding serious injury under the circumstances of the case. (*Aldrich* v. *Wright*, 53 N. H., 398; *S. C.*, 2 Green's Crim. R., 307.) It is a defensive and not an offensive act. (3 Texas Ct. App., 581; 6 Texas Ct. App., 191; 7 Texas Ct. App., 269, 436; 8 Texas Ct. App., 129.) It is founded on the law of nature, and is not, nor can be, superseded by any law of society. "Where murder or any other known felony is attempted upon the person of another, the party assaulted may repel force by force, and his servant attendant upon him, or any other person present, may interpose for preventing the mischief; and if death ensue, the party so interfering will be justified." (Whart. on Hom. (2d ed.), § 532.) This perfect right of defense which attaches to the person extends also to the protection of his habitation or "castle" (1 Bish. Cr. L. (7th ed.), § 860; *Richardson* v. *The State*, 7 Texas Ct. App., 486), and under certain restrictions even to the defense of corporeal personal property. In this latter case the restrictions are that "all other means must be resorted to for the prevention of the injury, and the killing

must take place while the person killed is in the very act of making such unlawful and violent attack; and any person interfering in such case in behalf of the party about to be injured is not justifiable in killing the aggressor unless the life or person of the injured party is in peril by reason of such attack upon his property." (Penal Code, art. 572.) "Every other effort in his power must have been made by the possessor (and *a fortiori* by the person acting in his behalf) to repel the aggression before he will be justified in killing." (Penal Code, art. 575, subdivis. 4.)

Where a felony is threatened the party may repel it, whether leveled at himself or others; "but the force of defense must be proportioned to the force of attack. It is but reasonable that the kind and amount of defense should be measurably proportioned to the amount and kind of danger." "A *bona fide* belief by the defendant that a felony is in process of commission which can only be arrested by the death of the supposed felon makes the killing excusable homicide." (Whart. on Hom., § 533; Desty's Amer. Crim. Law, §§ 125*d*, 126*d*.)

But "to justify the defensive destruction of human life the danger must be not problematical and remote, but evident and immediate." (*Aldrich* v. *Wright, supra.*) "The attempt must not be merely suspected but (reasonably) apparent; the danger must be (apparently) imminent, and the opposing force or resistance must be necessary to avert the danger or defeat the attempt." (3 Greenl. Ev. (13th ed.), § 115; Desty's Amer. Crim. L., § 126*d*.) "The law holds the life of man in the highest regard. And only in extreme instances of wrong-doing, and impelled by an extreme necessity, can another take it innocently away. Therefore, when, in general, a person is in the commission of any mischief, whether civil or criminal, no other person opposing him, however lawfully, is entitled to proceed in such opposition to the taking of his life. But to this rule there are exceptions, of which the most prominent one relates to felony. Anciently the punishment of felony was death, from which reason or from some other not appearing, it became established doctrine both in England and our states that one may oppose another who is attempting to perpetrate any felony, to the extinguishment, if need be, of the felon's existence." (1 Bish. Crim. L., § 849.)

It seems, however, that the right to take life does not extend to nor authorize the killing of persons attempting secret felonies not accompanied with force. (Whart. on Hom., § 539.) In Pond's case, 8 Mich., 150, the doctrine is thus stated, viz.: "It is held to be

the duty of every man who sees a felony attempted by violence to prevent it if possible, and in the performance of this duty, which is an active one, there is a legal right to use all legal means to make the resistance effectual.   Where a felonious act is not of a violent or forcible character, as in picking pockets and crimes partaking of fraud rather than force, there is no necessity and therefore no justification for homicide, unless possibly in some exceptional cases. The rule extends only to cases of felony, and in these it is lawful to resist force by force.  .  .  .  Life may not properly be taken under this rule where the evil may be prevented by other means within the power of the person who interferes against the felon. Reasonable apprehension, however, is sufficient here precisely as in all other cases."   A killing is not excusable if the felony resisted, though most atrocious, could be prevented by less violent action, for, as above stated, the right of resistance depends upon the necessity of the case, and the danger to be averted must be apparently immediate, pressing, imminent and unavoidable.   The necessities of self-defense are limited to the immediate resistance of aggression, and the apprehension must have been excited by an actual assault. (Desty's Crim. L., § 125*d*.)   Mr. Bishop says: "Though it is lawful for one to oppose another who is committing a felony, even to the taking of his life, yet, if there is no obstacle to his arrest, the shooting of him in the felonious act, instead of having him arrested, is a felonious homicide."   (1 Bish. Crim. L., § 843; Whart. on Hom., § 536; Desty's Amer. Crim. L., §§ 125*d*, 126*d*.)

One in defense of his own or another's property must not kill the aggressor until all other means have been resorted to; he must find his redress in the courts.   "If the wrongful act is proceeding to a felony on the property, he may then kill the doer to prevent the felony, if there is no other way; otherwise this extreme measure is not lawful.   And the defense may be such and such only as necessity requires; of course within the limit which forbids the taking of life."   (1 Bish. Cr. L., § 875.)   It is provided by our statute that "a peace-officer, *or any other person*, may, without warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony, or as an offense against the public peace."   (Code Crim. Proc., art. 226; *Staples* v. *The State*, 14 Texas Ct. App., 136.)

These are the principles of law applicable to the facts of this case. Deducible from these principles are the following rules relative to a a homicide claimed to be justifiable in defense of life or property, viz.:

1. To justify homicide in defense of one's own life or the life of

another or others, it must be in necessary resistance to aggression apparently violent, immediate and imminent, towards the person about to be injured.

2. To justify homicide to prevent the perpetration of any other felony, the danger or felony intended must not be problematical or remote, but evident and immediate.

3. It is in no case, except as to habitation or castle, justifiable to kill in defense of one's own or the property of another, until every other means have been resorted to to prevent the injury or violence attempted.

4. In no case of felony or attempted felony is it lawful to take life where the party may be arrested and the felony thereby prevented.

5. Any person may arrest, with or without warrant, a party committing or who has committed a felony in his presence or within his view.

Now to apply these principles to the facts of the case. Concede that the deceased placed the obstruction upon the railroad track, that of itself, as we have seen, was a felony. Concede that he placed it there with the intent and for the purpose of endangering and causing the destruction of human life,— in other words, to murder the innocent and unsuspecting officials and passengers who might be upon the next train. Still the fact that they would be killed or their lives endangered was problematical and remote so long as the train was not immediately approaching with apparent and unavoidable proximity to the obstruction. Suppose the object was to destroy only the property of the railroad company by throwing a freight train from the track and breaking up its cars,— that result was equally as remote and problematical. In neither of these cases, as we have seen, could defendant justify his act in taking deceased's life, either for the felony already committed in placing the obstruction upon the track, or the felony of murder or destruction of property, it was supposed or presumed he intended to commit.

Again, deceased was unarmed,— defendant armed with a double-barreled shot-gun. He had been sent there purposely to guard the railroad track, to arrest and prevent parties whom he might see placing obstructions on the track, and he assumed the duty under promise of a reward from the management of the road of $200, to be paid for any such arrest, or "to be paid whether the guilty parties be arrested and convicted, or be shot and killed while in the act of attempting to wreck a train."

Defendant went, we presume, to arrest or kill such parties. He

is presumed to have known that the law authorized and made it his duty to arrest the parties. He had the same authority as any peace officer would have had. He had the time, he had the means, he had the authority not only of his employers but of the law; it was his duty to arrest. The portions of the charge of the learned trial judge to the jury which are earnestly complained of by counsel for appellant are as follows:

"12. The act of wilfully placing an obstruction upon the track of a railway, endangering human life thereby, is a felony; and under the law any person may, without warrant, arrest the offender when the offense is committed within view of the person making such arrest; but under the law neither officer nor other person can lawfully take the life of such offender, whose arrest may be so made or sought to be made, unless the officer or other person making the arrest has just ground to fear his own life will be taken, or that he will suffer great bodily harm; in which cases life may be taken.

"13. If, therefore, the jury find from the testimony that the deceased placed such obstacle upon the track of the Austin & Northwestern Railway, endangering human life, in view of defendant, and that defendant sought to arrest deceased, and that deceased resisted, or so acted as to give the defendant just ground to fear his own life or great bodily harm, and that in such circumstances the defendant shot and killed deceased, then such killing is by the law excused, and the jury should acquit.

"If, however, in such attempt by defendant to arrest deceased, and if there be in evidence nothing showing, or tending to show, that the deceased so acted as to give defendant just or apparent ground of fear of his life, or of great bodily harm, and if the jury find from the testimony, beyond a reasonable doubt, that in such circumstances the defendant shot and killed deceased, then such killing would be unlawful, even if the killing was made in attempting the arrest of the deceased; and if the killing was intentionally and deliberately done, the act would be murder.

"The mere placing of the stone upon the railway track, if done, would not excuse or justify the killing, if proved."

To this charge appellant at the time specially excepted.

It is claimed that these instructions are erroneous because there was no evidence showing or tending to show that appellant killed deceased while resisting his attempted arrest. He has no right to complain. It was but charity, if not a right to which he was entitled, to give him the benefit of a charge upon the only hypothesis upon which the law would justify his taking the life of the de-

ceased.  The instructions are in entire harmony with the rules of law as above announced.

We have given this case our most earnest and thorough consideration.  There is no manslaughter involved in it.  It is solely a case of murder or justifiable homicide.  These issues were fairly submitted to the jury.  They have found that it was murder of the first degree,— a murder the express malice of which is evidenced by a lying in wait.  The learned judge who heard the testimony, and was in better position to pass upon its weight and sufficiency than we are, overruled defendant's motion for a new trial.  As presented in this record, we think it amply supports the verdict and judgment, and being unable to see that any error was committed at the trial, the judgment is affirmed.

*Affirmed.*

[Opinion delivered December 9, 1885.]